UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

—————————————————————————

ANDREW MELTON,

                            Plaintiff,                    DECISION AND ORDER
                                                          24-CV-6248-EAW-MJP

                v.

URBAN LEAGUE INSTITUTE OF
ROCHESTER, N.Y., INC. and
SEANELLE HAWKINS, individually,

                            Defendants.

—————————————————————————

    **Pedersen, M.J.** Plaintiff Andrew Melton ("Plaintiff") commenced this action

on April 25, 2024, alleging that defendants Urban League Institute of Rochester,

N.Y., Inc. ("Urban League")[1] and Seanelle Hawkins, individually (collectively

"Defendants") retaliated against him for whistleblowing activities in violation of New

York Labor Law § 740 and failed to pay him accrued vacation in violation of New

York Labor Law § 98-c. (Compl., ECF No. 1.) Further, Plaintiff asserts that

Defendants materially violated the whistleblowing policy requirements of New York

Not-for-Profit Corporation Law § 715-b. (*Id.*)

    Presently before the Court is Plaintiff's motion to disqualify the Law Offices of

Pullano & Farrow PLLC ("Pullano & Farrow") as counsel for Defendants in this

---

[1] Plaintiff refers to the "Urban League Institute of Rochester, N.Y., Inc." as "ULR" in
his papers.

action pursuant to federal common law and Rule 3.7 of the New York Rules of Professional Conduct. (Notice of Mot., Aug. 7, 2024, ECF No. 11.)

In reaching a decision on this motion the Court considered the parties' briefing (ECF Nos. 11, 19, 22), the *in camera* proceeding conducted on October 7, 2024, as well as the transcript thereof (ECF Nos. 25, 26), and the parties' post-hearing briefing (ECF Nos. 31, 35, 36). For the reasons discussed below, the Court denies Plaintiff's motion to disqualify Pullano & Farrow as Defendants' counsel (ECF No. 11).

## BACKGROUND

### *The parties' assertions in their pre-hearing briefing.*

In his declaration, Plaintiff asserts that "Defendants employed me as Chief Financial Officer from June 13, 2022 to November 8, 2022." (Melton Dec. ¶ 1, Aug. 7, 2024, ECF No. 11-1.) He further indicates that "[o]n September 12, 2022, I sent a report to Defendant Hawkins and the Board of Directors' Finance Committee detailing ten critical issues that I believed exposed ULR to liability and/or legal action. I sent this in preparation for the Finance Committee's meeting that was scheduled to be held the next morning, September 13." (*Id*. ¶ 3.) He contends that thereafter Seanelle Hawkins, the President and CEO of Urban League, "began phoning and emailing [him] . . . demanded information from [him], demanded that [he] speak with her, demanded to see a plan of action, forbade [him] to attend the Finance Committee meeting, which was scheduled for 11:30 a.m., and demanded that [he] meet with her alone instead." (*Id*. ¶ 4.) He thereafter "reported to the Board that [he] believed this was retaliation for [his] reporting the critical issues to the Finance

2

Committee, and [he] asked that she stop contacting [him]." (*Id.*)

Plaintiff attended the Finance Committee meeting on September 13, 2022, but asserts that Defendant "Hawkins then stated that [his] communications were hostile and placed ULR 'at risk' . . . [and that] Hawkins then turned the conversation to a discussion of firing [him]." (*Id.* ¶ 6.) Plaintiff asserts that he was locked out of Urban League's network that afternoon. (*Id.* ¶ 7.)

On September 15, 2022, Elizabeth Cordello, Esq., a member of Pullano & Farrow, "left [Plaintiff] a voicemail and sent [him] an email stating that her firm was asked to follow up with [him] about the concerns [he] raised earlier that week. She then demanded a list of nine specific items unrelated to any of the concerns [he] raised." (*Id.* ¶ 8.) Ms. Cordello indicated in her follow-up email that "[o]ur office serves as legal advisors to the Urban League of Rochester ("URL"). We have been asked by URL's Board to follow up with you to further review concerns you raised earlier this week" and also requested nine categories of documents/information. (Pl.'s MOL at 3, ECF No. 11-7 & Ex. B, Sept. 15, 2022, email from E. Cordello to A. Melton, ECF No. 11-4.)

On September 16, 2022, Ms. Cordello sent an email following up on requesting the categories of documents and providing, in part,

> [a]s you know, you have alleged unlawful retaliation against the CEO of ULR. Because it is a complaint against the CEO specifically, the Board determined it would be prudent to outsource the investigation of your claims to our firm so that the claims may be fully vetted and addressed appropriately. I look forward to speaking with you on Monday to get a full account of the unlawful retaliation.

(Email from E. Cordello to A. Melton, Sept. 16, 2022, marked as Ex. 1 at Oct. 7, 2024,

evidentiary hearing.)

      Plaintiff thereafter contends that:

> The following Monday, September 19, 2022, I met by videoconference
> with Cordello and made an audio recording of the meeting because her
> September 15 email had already caused me to doubt that she would in
> fact investigate the concerns I raised.[2] During that meeting, Cordello
> denied that she was investigating me, and explained that she was
> investigating my complaint of retaliation as a "third party investigator"
> standing in for Human Resources to ensure impartiality, given that my
> complaint was against ULR's CEO. She asked me questions about the
> critical issues I reported to the Board and Hawkins' retaliation. At the
> end of the meeting, I stated that I was locked out of ULR's network and
> I believed that was further retaliation. She then informed me that ULR
> had decided to place me on a paid leave of absence pending her
> investigation, and she explained this by saying that I had asked for
> Hawkins and Human Resources to stop communicating with me. I
> objected to that, and she had nothing further to say, making me again
> believe that she was really just following Hawkins' instructions and not
> really intending to investigate my concerns. The meeting lasted 30
> minutes.

(*Id.* ¶ 9.)

---

[2] The Court listened to the recording of the September 19, 2022, videoconference and
Ms. Cordello indicated as follows:

> Just to be clear and as I've always said, the Board has engaged me to review
> your complaint of retaliation, ah, you didn't feel comfortable that HR was
> impartial, understandably so because the complaint's against the CEO. And
> when you have a complaint of unlawful conduct pending against a CEO of a
> non-for-profit organization it is typical that the Board would engage a third-
> party investigator to review the claim. Ah, I requested those documents because
> you've indicated a preference not to engage directly with the CEO. She had
> requested that information. Rather than have you communicate directly with
> her it was asked that I ask you for that information. But I am not here to review
> your completion [sic] of that information or your performance. I am here to
> review your complaint.

(Consiglio Dec. ¶ 4 and Ex. C (filed manually under seal).)

Plaintiff asserts that he

> never heard another word about any investigation of my report of critical
> issues, my complaint of retaliation, or Hawkins' threat to fire me and
> accusations against me. No one asked me for any further information.
> Instead, Cordello fired me in a three-minute meeting on November 9,
> 2022, which I also recorded, after telling me that ULR concluded its
> investigation and determined that "the employment relationship with
> me wasn't working." That was the only explanation she gave me,
> without a word about her own investigation or any findings of any
> investigation. Not only did this confirm my belief that Cordello never
> conducted an investigation, it also contradicted the procedures and
> policies stated in the Employee Handbook, which was incorporated by
> emphatic reference in my offer letter.

(*Id.* ¶¶ 10–11.)

In response to Plaintiff's motion, Ms. Cordello submitted a declaration in which
she asserts that "[a]t all relevant times, I acted solely in the capacity of Defendants'
legal counsel [and that] [i]n or about September 2022, Defendants requested that I
communicate with Plaintiff on their behalf as their attorney due to Plaintiff's refusal
to communicate directly with Defendants." (Cordello Dec. ¶¶ 3–4, Aug. 29, 2024, ECF
No. 20.) She further indicates that as counsel for Defendants she "did investigate and
advise Defendants with respect to the claims raised by Plaintiff.[3] Such advice and
counsel are attorney-client privileged." Ms. Cordello also asserts that "[t]he quote
attributed to [her] in paragraph 11 of Plaintiff's Declaration submitted in support of
his motion ('the employment relationship with you isn't working') is partial and
misleading. (Filing No. 11-1, at CM/ECF p. 4.) . . . The full quote (as provided in

---

[3] The Court is unclear about which "claims" Ms. Cordello is referring here, whether it
be the critical issues raised in the memo to the Finance Committee or Plaintiff's claim for
retaliation, both, or neither of those.

Exhibit D to Plaintiff's motion) is: 'In continuance of the discussion that started with you in late August, the Urban League has determined the employment relationship with you isn't working.'" (*Id.* ¶¶ 7–8.) Finally, Ms. Cordello stated that "[a]s indicated in Exhibit D to Plaintiff's motion, Plaintiff did not disagree with my statement that the employment relationship 'wasn't working' had first been communicated to him by Defendants in late August, prior to my involvement and his Complaint." (*Id.* ¶ 9.)

Langston McFadden, Esq., Defendants' current counsel in this matter and also a member of Pullano & Farrow, submitted a declaration in opposition to Plaintiff's motion to disqualify. He indicates that prior to the meeting Ms. Hawkins scheduled for September 13, 2022, Ms. Hawkins asked Plaintiff for financial information in connection with the meeting and "instead of receiving the requested financial documentation . . . Defendant Hawkins was copied in on an email that provided a memo Plaintiff submitted to the Board of Directors [that] outlined various concerns Plaintiff had with Defendant Urban League and its management." (McFadden Dec. ¶¶ 18, 21, 22, Aug. 29, 2024, ECF No. 21.) Since Plaintiff had not provided the requested financial documents at the meeting on September 13th Defendant Hawkins "asked Plaintiff to respond to the previous e-mails she had sent to him requesting the financial documentation, and then dismissed Plaintiff from the meeting . . . hoping Plaintiff would use the time to complete and submit the financial documentation she had been requesting." (*Id.* ¶ 26.)

Mr. McFadden further asserts that

As a result of Plaintiff's hostility and refusal to respond to communications from Defendants Hawkins, Defendant Urban League's

> Board engaged Pullano & Farrow to investigate Plaintiff's claims. On September 15, 2022, Defendants' attorney, Elizabeth A. Cordello, sent an email to Plaintiff advising that she was asked to follow up with Plaintiff regarding his claim of retaliation. In this email, Elizabeth A. Cordello requested information from Plaintiff, which Plaintiff refused to provide. In an attempt to investigate Plaintiff's retaliation claims, Ms. Cordello scheduled a videoconference with Plaintiff for September 19, 2022.

(*Id.* ¶ 34.) He indicates that on September 19, 2024, Ms. Cordello met with Plaintiff via teleconference "to discuss his claims of retaliation. In the meeting, Elizabeth Cordello asked Plaintiff why he believed Defendant Hawkins had violated company policies. Ms. Cordello also discussed with Plaintiff the memo he submitted to the Board of Directors and Defendant Hawkins on the evening of September 12, 2022. During the meeting, Plaintiff stated he was alleging retaliation stemming from his belief that his memo constituted whistleblowing." (*Id.* ¶¶ 35–36.) Also during the meeting Ms. Cordello "inform[ed] Plaintiff that he was being placed on paid leave pending the completion of an investigation of his complaint" and that she was conveying this information on Urban League's behalf because "Plaintiff refused to have any interactions with Urban League employers or leadership." (*Id.* ¶¶ 37–38.) It was Defendant Hawkins's decision to terminate Plaintiff after Urban League conducted an "investigation into Plaintiff's job performance . . . [because] he was not completing his job duties as the Chief Financial Officer." (*Id.* ¶¶ 39, 42.) Ms. Cordello was not consulted nor involved in making the decision to terminate Plaintiff's employment and her "sole role as counsel for the company was to conduct an investigation into Plaintiff's claims of retaliation." (*Id.* ¶¶ 40–41.) Finally, Mr. McFadden asserts that "[a]t all times herein Elizabeth A. Cordello and Pullano &

Farrow have expressed themselves as counsel for Defendants" and "[a]t no time was there any ambiguity as to the role of Pullano & Farrow as Defendants' chosen counsel." (*Id.* ¶¶ 55, 57.)

**Relevant testimony from the October 7, 2024, evidentiary hearing at which Elizabeth Cordello, Esq. testified.**

At the hearing Defendants' counsel questioned Ms. Cordello about the nature of her relationship with the Urban League and she testified as follows:

> Q.    Good morning, Ms. Cordello. Can you explain to the Court exactly who hired you and for what purpose were you hired with respect to your work at the Urban League?
>
> A.    Yes. So our firm has long been legal counsel to the Urban League of Rochester, and with respect to this matter, the board of the Urban League of Rochester engaged me with regard to this matter.

(Tr. of Oct. 7, 2024 Evidentiary Hearing 5:6–13, ECF No. 26.) The Court sought clarification from Ms. Cordello regarding what she meant by "this matter" and she testified that "Mr. Melton made a complaint about – several complaints about the CEO Sean [sic] Hawkins, and the board asked me to see if there was any bearing [sic] with regard to Seanelle Hawkins' conduct." (*Id.* 5:14–19.) She further testified that she completed an investigation into "whether Seanelle Hawkins should be terminated or if there is any merit to the allegations Mr. Melton made" and concluded that Seanelle Hawkins did not need to be dismissed. (*Id.* 6:4–15; 7:3–11; 8:10–13.) She stated that she was hired by the Board to investigate the allegations of the report Plaintiff provided to the Board. (*Id.* 7:25–8:2; 8:23–9:3; 10:12–11:11.)

When further questioned by Plaintiff's counsel as to why the Board hired her, Ms. Cordello testified as follows:

Q.    Then if I'm understanding you correctly, you were not investigating the question of whether Ms. Hawkins had retaliated against Mr. Melton. Am I understanding that correctly?

A.    If true, if those allegations are true, then it might have been a question as to what her motive was because prior to him submitting that report she had decided to terminate him. So I guess that would have been a secondary issue to look at if there was merit to what he was raising.

Q.    Were you aware that he had told the board he believed that Ms. Hawkins was retaliating against him for sending that report at the time that you began your investigation?

A.    I don't recall. I'm not sure that I fully understand the question, but I don't think I – can you repeat the question?

Q.    Sure. I'm trying to understand whether you were investigating a retaliation claim by Mr. Melton.

A.    I would say no because he -- he had already -- she had already made the decision with respect to his employment, but like I said, if there was merit to what he was saying and she was doing these things, then as a secondary issue I'd have to look at whether that decision she had made was also, you know, an attempt to blame someone else if you will or something like that, but the board's primary concern in that moment was whether any of that was true and whether the CEO was engaging in this conduct.

(*Id.* 10:16–11:11.)

She further testified regarding whether she was involved in the decision to

terminate Plaintiff's employment as follows:

Q.    During the course of your investigation, did you make any determination as  to whether Mr. Melton's employment with the Urban League of Rochester should be terminated?

A.    No. It is my understanding that decision had been made prior -- just prior to his complaint. I was looking at whether Seanelle Hawkins should be terminated or if there is any merit to the allegations Mr. Melton made.

Q.    And it's my understanding that you communicated the subsequent termination to Mr. Melton. Why was that?

9

> A.   Because he would not speak with anyone at the organization.

(*Id.* 7:3–16.) She later testified as follows:

> Q.   Okay. And Ms. Cordello, you said that the CEO for the organization communicated to Mr. Melton before September 12 that he was going to be terminated; did I understand that correctly?
>
> A.   You did.
>
> Q.   And how do you know that?
>
> A.   Because I think it's in -- even in the papers, but at the time I recall understanding that. I would have to go look at my notes in the file to give you more particulars on that, but it was my understanding that they had already communicated to him in late August or maybe early September, I don't know, that it wasn't working out.

(*Id.* 19:11–23.)

**Post-Hearing Briefing**

Plaintiff argues that Ms. Cordello's testimony will be prejudicial to Defendants because Ms. Cordello testified that "her investigation centered around whether the ten Critical Issues revealed wrongdoing by Hawkins," which raises the issue of "whether Plaintiff's allegation of retaliation was investigated **at all** before his employment was terminated in November 2022." (Consiglio Dec. ¶¶ 8–9, Nov. 6, 2024, ECF No. 31, emphasis in original.) Similarly, Plaintiff contends that Ms. Cordello's testimony will prejudice Defendants because it "disavowed the documentary evidence" that she was investigating the retaliation claim. (*Id.* ¶ 11.) Plaintiff further asserts that Ms. Cordello's testimony is prejudicial because Defendants did not provide any

evidence that Defendants communicated Plaintiff's termination to him prior to his submission of the critical issues memo to the Board. (*Id.* ¶ 10.) Additionally, Plaintiff contends that harm to the integrity of the judicial system will result because of Ms. Cordello's testimony in which she "disavow[ed] [ ] the documentary evidence of her owns statements to Plaintiff" and her

> willingness to disavow the clear terms of the investigation that she undertook, to present more argument than evidence during her testimony, to present hearsay about Plaintiffs termination for which no documentary evidence exists, and indeed, to fail to even identify a specific actor as the source for that alleged hearsay.

(*Id.* ¶ 16.)

In opposition, Defendants contend that Plaintiff failed to meet the high burden necessary to disqualify Pullano & Farrow. (Defs.' Reply Mem. of Law at 1, ECF No. 35.) Defendants assert that since there has been no exchange of discovery "it is hard to imagine how [Plaintiff's] counsel can suggest with any certainty that Ms. Cordello's testimony, actions or inactions will be prejudicial to the interests of Defendants." (*Id.* at 3.) For this reason, Defendants argue that Plaintiff's "vague and speculative supposition" is not sufficient to satisfy the requirement of *Murray v. Metro. Life Ins. Co.*, 583 F.3d 173 (2d Cir. 2009) to specifically identify "the issues where prejudice exists and how said prejudice would occur." (*Id.* at 3, 4.) Finally, Defendants contend that Plaintiff "failed to offer any specific examples as to how the judicial system will suffer as a result of Ms. Cordello's role in Plaintiff's claims against Defendants." (*Id.* at 6.)

## ANALYSIS

"The authority of federal courts to disqualify attorneys derives from their inherent power 'to preserve the integrity of the adversary process.'" *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (quoting *Bd. of Educ. of City of N.Y. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)). Motions to disqualify are generally viewed with disfavor, and "[w]hether to grant a motion to disqualify is committed to the discretion of the court." *Wieme v. Eastman Kodak Co.*, No. 02–CV–6021L, 2004 WL 2271402, at *1 (W.D.N.Y. Sept. 7, 2004). In evaluating a motion to disqualify, a court must balance "'a client's right freely to choose his counsel' against 'the need to maintain the highest standards of the profession.'" *Hempstead Video*, 409 F.3d at 132 (citing *Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737, 739 (2d Cir. 1978)). Moreover, while the New York Code of Professional Responsibility can "provide general guidance," it is not binding on a federal court assessing the merits of a motion to disqualify. *Id.* ("[N]ot every violation of a disciplinary rule will necessarily lead to disqualification . . . .").

A party moving for disqualification carries "a 'heavy burden' and must satisfy 'a high standard of proof.'" *Wieme*, 2004 WL 2271402, at *1 (quoting *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791, 794 (2d Cir. 1983)). Indeed, a court faced with a disqualification motion must recognize that "disqualification has an immediate adverse effect on the client by separating him from counsel of his choice, and that disqualification motions are often interposed for tactical reasons." *Bd. of Educ. of City of N.Y.*, 590 F.2d at 1246. The Second Circuit has instructed that if there are doubts

about the matter, those doubts should be resolved in favor of disqualification." *Wieme*, 2004 WL 2271402, at *2 (citing *Cheng v. GAF Corp.*, 631 F.2d 1052, 1059 (2d Cir. 1980), *vacated on other grounds*, 450 U.S. 903 (1981); *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975).

Subsection (a) of [the New York Rules of Professional Conduct] provides, with certain exceptions, that "[a] lawyer shall not act as an advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact." N.Y. R. Prof'l Conduct § 3.7(a). Subsection (b), at issue here, is broader, as it addresses imputation: "A lawyer may not act as an advocate before a tribunal in a matter if . . . another lawyer in the lawyer's firm is likely to be called as a witness on a significant issue other than on behalf of the client, and it is apparent that the testimony may be prejudicial to the client." *See* N.Y. R. Prof'l Conduct § 3.7(b)(1).

 "Because the courts must guard against tactical use of motions to disqualify counsel, they are subject to fairly strict scrutiny, particularly motions" fall under subsection 3.7(a), the witness-advocate rule. *Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir. 1989) (internal quotation and citation omitted)). Accordingly, the movant "bears the burden of demonstrating specifically how and as to what issues in the case the prejudice may occur and that the likelihood of prejudice occurring [to the witness-advocate's client] is substantial." *Id.* (citations omitted). In this context "prejudice" means testimony that is "sufficiently adverse to the factual assertions or account of events offered on behalf of the client, such that the bar or the client might have an interest in the lawyer's independence in discrediting that testimony." *Id.* (citation

omitted).

The showing of prejudice is required to determine whether the ultimate reason for disqualification exists—harm to the integrity of the judicial system. *Murray*, 583 F.3d at 178. The Second Circuit has identified four risks that Rule 3.7(a) is designed to alleviate: (1) the lawyer might appear to vouch for his own credibility; (2) the lawyer's testimony might place opposing counsel in a difficult position when he has to cross-examine his lawyer-adversary and attempt to impeach his credibility; (3) some may fear that the testifying attorney is distorting the truth as a result of bias in favor of his client; and (4) when an individual assumes the role of both advocate and witness, the line between argument and evidence may be blurred, thereby undermining the jury's ability engage in its fact-finding duties. *Ramey v. Dist. 141, Int'l Ass'n of Machinists & Aerospace Workers*, 378 F.3d 269, 282–83 (2d Cir. 2004) (internal citations and alterations omitted). The above-listed concerns are relevant because they could undermine the integrity of the judicial process.

The present case falls under Rule 3.7(b) where the witness is not acting as trial counsel. The Second Circuit has clearly provided that the four above-listed concerns are therefore "absent or, at least, greatly reduced" in such a case. *Ramey*, 378 F.3d at 283 (citation omitted); *see also* A.B.A. Model Rules of Prof'l Conduct § 3.7 cmt. 5 ("Because the tribunal is not likely to be misled when a lawyer acts as advocate in a trial in which another lawyer in the lawyer's firm will testify as a necessary witness, [Model Rule 3.7(b)] permits the lawyer to do so except in situations involving a conflict of interest."). The Second Circuit advises that disqualification by imputation should

be ordered sparingly, *see Kubin v. Miller*, 801 F. Supp. 1101, 1114 (1992), and only when the four above-listed concerns are strongly implicated. In other words, disqualification by imputation is only permitted where "the movant proves by clear and convincing evidence that [A] the witness will provide testimony prejudicial to the client, and [B] the integrity of the judicial system will suffer as a result." *Murray*, 583 F.3d at 178.

The Court finds that Plaintiff has failed to demonstrate by clear and convincing evidence that Cordello will provide testimony that will be prejudicial to Defendants such that the integrity of the judicial system will suffer. First, based on Ms. Cordello's testimony at the October 7, 2024, evidentiary hearing, the Court believes that, at trial, Ms. Cordello will vouch for her own credibility. The second risk— that the lawyer's testimony might place opposing counsel in a difficult position when he has to cross-examine his lawyer-adversary and attempt to impeach his credibility—is not applicable here because Plaintiff's counsel will be cross-examining Ms. Cordello, not Defendants' trial counsel, Mr. McFadden. This weighs against disqualification.

The third risk—that there may be fear that Ms. Cordello could be distorting the truth as a result of bias in favor of Defendants is a possibility here. However, Plaintiff has not provided any clear and convincing evidence that this will happen. As the facts presently stand, there is an email from September 16, 2022, and a recorded meeting between Ms. Cordello and Plaintiff from September 19, 2022, in which Ms. Cordello represents that she is investigating Plaintiff's claim of retaliation. However, Ms. Cordello also gave sworn testimony that the Board of Urban League

engaged her to look into the issues raised in Plaintiff's "critical issues" memo and not Plaintiff's claim of retaliation. (Tr. 5:6–6:13; 10:4–11:1; 11:2–12:5; 24:21–25:20.) In other words, the facts are not clear at this very early stage and Plaintiff cannot state with certainty what testimony will be elicited from Ms. Cordello. Therefore, this weighs against disqualification.

Finally, with respect to the fourth risk, Ms. Cordello is not assuming the role of both trial advocate and witness, so any risk of her involvement blurring the line between argument and evidence and confusing the jury is nil. Accordingly, this also weighs against disqualification.

In addition, the information that Plaintiff seeks in his post-hearing briefing, such as Ms. Cordello's "final written report of her investigation" to demonstrate if Defendants investigated Plaintiff's claims of retaliation, and documentary proof "that the decision to terminate Plaintiff's employment preceded Plaintiff's report to the Board of ten Critical Issues and preceded Plaintiff's allegation of retaliation" demonstrate that Plaintiff's motion is premature. (Consiglio Dec. ¶¶ 23–28, ECF No. 31.); *Cassini v. Cnty. of Nassau*, No. CV 22-1696 (DG) (AYS), 2023 WL 6958795, at *3 (E.D.N.Y. Oct. 20, 2023) ("where there has been only limited discovery and it is not yet clear the extent to which an attorney's testimony might be necessary or prejudicial, numerous courts have found that motions to disqualify counsel are premature.") (citing *Prout v. Vladeck*, 316 F. Supp.3d 784, 809 (S.D.N.Y. 2018), *reconsideration denied*, (citing *Ross v. Blister*, No. 09-cv-8666, 2009 WL 4907062, at *3 (S.D.N.Y. Dec. 21, 2009) (collecting cases)); *see also Gormin v. Hubregsen*, No. 08

Civ. 7674, 2009 WL 508269, at *3 (S.D.N.Y. Feb. 27, 2009) (noting that prior to discovery, "it is impossible to determine how significant [the attorney] might be as a witness or whether he is likely even to be called as a witness; whether his testimony would likely help or hurt his client; or whether his testimony would or would not be cumulative of other witnesses."). This information will likely be the subject of discovery between the parties. The Court will not delve into the merits of the case on the present motion for disqualification.

Based upon the forgoing, and as the facts exist at this moment, Plaintiff has not carried his burden of demonstrating by clear and convincing evidence that Ms. Cordello will provide testimony that is prejudicial to Defendants. Without proof of this prejudice the Court cannot say that the integrity of the judiciary will be questioned if Pullano & Farrow continues to represent Defendants in this matter.

## **CONCLUSION**

For the reasons set forth above, the Court **DENIES without prejudice** Plaintiff's motion to disqualify Pullano & Farrow as counsel for Defendants in this action (ECF No. 11).

IT IS SO ORDERED.

DATED:     February 26, 2025
           Rochester, New York

MARK W. PEDERSEN
United States Magistrate Judge

17